# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 97-KA-01117-COA

HANSON JENKINS, JR. A/K/A "BOB"                                              APPELLANT

v.

STATE OF MISSISSIPPI                                                          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 09/05/1997 |
| TRIAL JUDGE: | HON. C. E. MORGAN III |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | BILLY JOE GILMORE |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CHARLES W. MARIS JR. |
| DISTRICT ATTORNEY: | DOUGLAS EVANS |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | SALE AND POSSESSION OF MARIJUANA; 17 YEARS |
| DISPOSITION: | AFFIRMED - 5/18/99 |
| MOTION FOR REHEARING FILED: | 6/1/99; denied 08/10/99 |
| CERTIORARI FILED: | 08/24/99; granted 11/24/99 |
| MANDATE ISSUED: | |

EN BANC.

McMILLIN, C.J., FOR THE COURT:

¶1. Hanson Jenkins, Jr. appeals his conviction under both counts of a two count indictment charging him with sale of less than one ounce of marijuana and possession of more than one ounce of marijuana with intent to distribute. Jenkins raises six issues in this appeal. Finding them to be without merit for reasons we will proceed to discuss, we affirm the convictions.

## I.

## Facts

¶2. According to evidence presented by the State, a cooperating individual working with the Kosciusko Police Department arranged by telephone conference with Jenkins to purchase a quantity of marijuana, the transaction to be consummated at Jenkins's residence in rural Attala County. Police officers, relying in part on Jenkins's apparent willingness to sell marijuana as evidenced by the phone conversation, went before a justice court judge and obtained a search warrant for Jenkins's residence.

¶3. Later that same day, the officers and the cooperating individual traveled to Jenkins's residence where the cooperating individual was successful in purchasing a small quantity of marijuana from Jenkins. After that purchase was made, a number of police officers returned to the residence, placed Jenkins under arrest, and proceeded to execute the search warrant by undertaking a search of the premises. During the course of the search, a member of Jenkins's family informed the searchers that there was a supply of marijuana concealed in an automobile outside the residence. The officers searched that vehicle and, indeed, discovered a quantity of marijuana.

¶4. The sale to the cooperating individual led to the first count of Jenkins's indictment and the marijuana discovered in the automobile formed the basis for the second count.

## II.

## First Issue: Suppression of Evidence Seized Under the Search Warrant

¶5. Jenkins claims that the trial court committed reversible error when it refused to suppress the marijuana discovered in the automobile. Jenkins attacks the admission of the evidence on two fronts. First, he charges that the warrant was invalid because it was obtained through false representations to the magistrate issuing the warrant. Secondly, Jenkins contends that the search was unauthorized because the vehicle belonged not to him but to his wife, so that the officers had no authority to search the vehicle.

## A.

## Validity of the Warrant

¶6. Jenkins alleges that the police officer who obtained the search warrant misrepresented two key facts in his supporting affidavit. The officer reported to the magistrate that he heard the telephone conversation between Jenkins and the cooperating individual. Jenkins contends that such a conversation did not take place because, at the time it was alleged to have occurred, he was in his vehicle on the way to his employment. Secondly, Jenkins claims the officer misled the magistrate when he claimed to have personal knowledge that prior marijuana transactions had occurred at Jenkins's residence.

¶7. At the suppression hearing, the officer testified about his role in the telephone call to Jenkins made by the cooperating individual. As to the second question, the officer admitted that his knowledge of previous transactions had come from his participation in undercover operations and, though he had assisted in these buys, he had not observed any transaction first-hand.

¶8. Certainly, a search warrant obtained as the result of false assertions of material facts cannot meet constitutional muster. *Petti v. State,* 666 So. 2d 754, 758 (Miss. 1995). However, in this case, there was a disputed issue of fact as to whether the alleged telephone conversation between Jenkins and the

cooperating individual ever took place. The officer testified that the conversation took place and that he was present at the location where the cooperating individual placed the call, that he heard the cooperating individual's portion of the conversation, and that the cooperating individual immediately related to him the responses he had obtained from Jenkins. Jenkins, on the other hand, denied the conversation ever occurred. We are thus faced with three possibilities: (a) the officer fabricated the entire story, (b) the cooperating individual misled the officer as to whether he was actually speaking to Jenkins or as to what Jenkins's responses were, or (c) the telephone conversation actually took place as related to the magistrate.

¶9. A magistrate called upon to issue a search warrant has a duty to determine whether probable cause exists to believe that evidence of criminal conduct can be discovered at the place sought to be made subject to the search. *Davis v. State,* 660 So. 2d 1228, 1238 (Miss. 1995). He is not required to limit his decision to facts that would only be admissible under the rules of evidence. To the contrary, the magistrate can, and often does, rely on hearsay reports of criminal activity and such reliance is not objectionable so long as there is some indication that these hearsay reports are reliable. *Id.*; *Lee v. State,* 435 So. 2d 674, 676 (Miss. 1983). The facts offered by the investigating officer were, if true, sufficient to establish probable cause to believe that marijuana could be found at Jenkins's home place. It was not necessary for the officer to have actually heard Jenkins speaking on the other line in order for the facts surrounding that telephone conversation to weigh in on the question of probable cause for a search warrant to issue.

¶10. The same considerations apply as to the officer's report of personal knowledge of prior transactions. The officer did not falsely represent that he had actually observed such transactions, but only claimed to have personal knowledge that such transactions had occurred. We are of the opinion that an officer intimately involved in an undercover drug operation, working closely with other reliable persons, may rely upon knowledge gained indirectly from those other persons to reasonably form a belief that he has personal knowledge of the essential facts of the operation. Knowledge gained in such a manner, though the officer might be incompetent under the hearsay rule to relate some part of that knowledge in a subsequent trial, would nevertheless appear sufficiently trustworthy to establish probable cause for a search warrant to issue in the absence of something affirmatively demonstrating its unreliability.

¶11. On its face, the affidavit in support of the warrant request appears to establish a reasonable basis for the warrant to issue. The underlying question of whether the officer made false and misleading statements in order to obtain the warrant is a separate matter that could only be resolved by the circuit court at a suppression hearing since the proceeding relating to the issuance of the warrant is not an adversarial hearing where the veracity of the officer's representations can be tested.

¶12. At the suppression hearing, the State presented the testimony of the officer who obtained the warrant. He related those facts set out above. He explained the circumstances surrounding his assertion of first hand knowledge of prior transactions, and there is nothing in that explanation that would suggest any duplicity or misleading on his part when originally seeking the warrant. No evidence was presented to support the proposition that the cooperating individual's alleged telephone conversation with Jenkins was a fabrication except Jenkins's own self-serving testimony and that of a family member that, on the date and time in question, he was in transit to work. The trial court chose not to believe that the investigating officer participated in a scheme to obtain a search warrant under false colors. There is nothing so convincing in Jenkins's evidence that compels an unequivocal finding that the purported telephone conversation between him and the cooperating individual in which he agreed to sell him marijuana did not take place. That being the case, we are unable to find reversible error in the trial court's refusal to suppress any evidence gained as

a result of this search warrant.

## B.

## The Search of the Car was Unauthorized

¶13. Jenkins claims that the search warrant, which authorized a search only of "a white wood frame house together with all approaches and appurtenances thereto," could not possibly have extended to a search of a motor vehicle located on the property that was actually owned by his wife. The trial court, in refusing to suppress the marijuana found in the car on this argument, held that Jenkins did not have standing to assert a constitutional violation based on a warrantless search of property belonging to another. We conclude that the trial court ruled correctly. While Mrs. Jenkins might have some constitutional objection to the admissibility of contraband discovered pursuant to a warrantless search of her car were she on trial, the law is quite clear that Jenkins cannot vicariously assert her constitutional rights in such matters. *Ware v. State,* 410 So. 2d 1330, 1331 (Miss. 1982).

¶14. The State advances an alternate argument based on evidence that the vehicle was inoperable and appeared to be used as a storage facility, so that it might be considered an appurtenance to Jenkins's property covered by the warrant. We decline to consider this alternate argument. It is unnecessary to our decision and Jenkins did not raise the question of how far searchers could properly expand their area of a search on a warrant that, on its face, extends only to "a white wood frame house together with all approaches and appurtenances thereto." We leave such matters to another day when the question may vitally affect the outcome.

## III.

## The Second Issue: Defective Indictment

¶15. Jenkins moved for dismissal of the first count of the indictment at the end of the State's case based on the claim that the evidence was at substantial variance from the allegations of the indictment. Specifically, he pointed out that the indictment charged that he sold drugs "at a residence in the City of Sallis, Mississippi," when, in fact, his residence was in rural Attala County approximately eight miles from Sallis. The trial court denied the motion. No attempt was ever made by the trial court or the prosecution to amend the indictment. Jenkins now claims this failure to amend the indictment under authority contained in Section 99-17-13 of the Mississippi Code requires reversal of his conviction. We disagree. Section 99-17-13 permits an amendment to an indictment by the trial court to correct a variance between the charge in the indictment and the proof "in the name of any . . . city . . . mentioned in such indictment" if the court considers the variance "not material to the merits of the case, and that the defendant cannot be prejudiced thereby in his defense on the merits . . . ." Miss. Code Ann. § 99-17-13 (Rev. 1994).

¶16. The exact location of the crime can be critical when questions of venue arise, but matters of venue are determined by the lines dividing the State into counties and the judicial districts within certain counties and do not depend on municipal corporate boundaries. Whether the crime in this instance occurred inside the municipal boundaries of Sallis is not an essential element of the crime, nor a necessary element to establish venue. The only critical issue in that regard was that the alleged crime occurred in Attala County. Jenkins

demonstrates no prejudice in the preparation of his defense based on this apparently unnecessary and obviously incorrect insertion in the indictment. For instance, he does not demonstrate that he reasonably believed the indictment referred to some residence other than his own in another part of the county and that he had based his defense on that assumption. On these facts, we consider the geographic imprecision with which the State attempted to locate Jenkins's residence in the indictment to be a matter "not material to the merits of the case," and, therefore, an error that could not have prejudiced Jenkins in his defense. On such a finding, it would have been perfectly permissible for the trial court, after denying Jenkins's motion to dismiss, to order an amendment to the indictment to remove any reference to the place of commission of the crime as being within the boundaries of the City of Sallis. That the trial court failed to take this largely perfunctory step does nothing to magnify an essentially insignificant error in the manner in which Jenkins was charged, tried and convicted. We hold, therefore, that the trial court did not err in refusing to dismiss the first count of the indictment and we further hold that the trial court's failure to subsequently amend the indictment under authority of Section 99-17-13 to correct this error worked no prejudice to Jenkins and was, therefore, harmless.

## IV.

### The Third Issue: A Double Jeopardy Claim

¶17. The convictions now before us were the result of Jenkins's second trial on this indictment. The first trial ended in a mistrial declared by the trial court, on its own motion, when it was discovered that one juror selected to sit in trial of the case had, through circumstances not fully understood, failed to take his seat in the jury box. Instead, another member of the venire not selected as a juror had taken that seat. This problem was not discovered until the trial had commenced. Upon initial discovery of the problem, defense counsel moved for a mistrial but the trial court denied the motion, concluding that a qualified alternate juror could be substituted for the missing juror without any prejudice to the defendant. However, later during the proceeding, the prodigal juror was located and the trial court inquired further into the circumstances. At that point, it began to appear that the trial court, in calling out the names of those selected to sit on the jury, had failed to call this juror's name. The trial court was apparently of the opinion that the court's failure to call the juror presented a different circumstance than the case where the juror's name was actually called but the juror failed to properly respond. Based on these developments, and without seeking the view of either the State or the defense, the trial court declared a mistrial on its own motion.

¶18. Jenkins claimed at the trial level that this decision, taken on the court's own motion, barred his subsequent retrial under constitutional principles of double jeopardy. The trial court declined to halt the second trial based on this argument, and Jenkins now raises that decision as reversible error.

¶19. Not every instance where a mistrial is granted gives rise to a double jeopardy bar against a subsequent retrial. If, for example, the trial court had granted defense counsel's mistrial motion when the problem with the jury was first discovered, there is little doubt that a retrial would be permissible. *Nicholson ex rel. Gollot v. State,* 672 So. 2d 744, 750 (Miss. 1996). Even where the trial court declares a mistrial over the defendant's objection, a subsequent retrial may be permissible if granting a mistrial was a "manifest necessity" in view of the facts then existing. *Oregon v. Kennedy,* 456 U.S. 667, 672 (1982).

¶20. The issue we face in this case is whether there was a manifest necessity to declare a mistrial because of problems with one juror when there was an alternate juror, fully qualified to sit on the case, available to serve in the stead of the problem juror. Seating an alternate juror is a customary means of dealing with such

problems, whether an original juror becomes unavailable due to illness or whether it is subsequently discovered that there is some legal impediment to the juror sitting on the case. *Russell v. State,* 220 So. 2d 334, 337 (Miss. 1969). It is a practice sanctioned by statute. Miss. Code Ann. § 13-5-67 (Supp. 1998). That being the case, it might appear that the decision to declare a mistrial at a time when a fully qualified alternate was available would not be one born out of manifest necessity.

¶21. However, this Court finds that prior case law, both in the decisions of the United States Supreme Court and the Mississippi Supreme Court, leads to the conclusion that the trial court has some measure of discretion in dealing with problems with jurors and that the standard for determining whether a mistrial was a manifest necessity may not be so absolute as the phrase would seem to imply.

¶22. That the concept of manifest necessity applies to a mistrial growing out of problems relating to jurors cannot be disputed. In *Thompson v. United States,* 155 U.S. 271 (1894), the Supreme Court dealt with a case where

> [t]he record discloses that while the trial was proceeding, a jury having been sworn and a witness examined, the fact that one of the jury was disqualified by having been a member of the grand jury that found the indictment became known to the court. Thereupon the court, without the consent of the defendant, and under exception, discharged the jury, and directed that another jury be called. The defendant, by his counsel, pleaded that he had been once in jeopardy upon and for the same charge and offense for which he now stood charged.

*Id.* at 273.

¶23. Despite this assertion, Thompson was tried once again and convicted. The Supreme Court went on to say that

> [t]he defendant now seeks, in one of his assignments of error, the benefit of the constitutional provision that no person shall be subject for the same offense to be twice put in jeopardy of life and limb.

*Id.* at 274.

¶24. The Court rejected that proposition, saying that

> courts of justice are invested with the authority to discharge a jury from giving any verdict whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act . . . and to order a trial by another jury; and that the defendant is not thereby twice put in jeopardy, within the meaning of the fifth amendment to the constitution of the United States.

*Id.*

¶25. In the later case of *Arizona v. Washington,* the Supreme Court said that the term "necessity" could not be interpreted literally, but that there were "especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not "manifest necessity" justifies a discharge of the jury." *Arizona v. Washington,* 434 U.S. 497, 509(1978). The Court went so far as to suggest that the discretion given the trial court in such matters required a finding that the trial judge acted irrationally or irresponsibly in declaring a mistrial before double jeopardy might arise. *Id.* at 514.

¶26. With those considerations in mind, we turn to any applicable pronouncements on the issue by the Mississippi Supreme Court. In *Schwarzauer v. State,* the Supreme Court dealt with a case where, at the first trial, the court declared a mistrial on its own motion after two sequestered jurors had become separated from the remaining jurors and visited together. *Schwarzauer v. State,* 339 So. 2d 980, 981 (Miss. 1976). The defendant interposed a double jeopardy claim in an attempt to avoid a second trial, arguing that there was authority to the effect that this temporary separation of the jurors did not necessarily require a mistrial and that, therefore, there was no "manifest necessity" for that action. *Id.* The supreme court acknowledged that a mistrial was not an absolute necessity by observing that "another judge similarly situated might have followed a different course." *Id.* at 982. Nevertheless, the supreme court declined to interpose a double jeopardy bar to void Schwarzauer's conviction at his second trial. The supreme court first said that "there are no rigid rules that can be followed in every case where double jeopardy is argued," then went on to say that so long as the trial judge "appropriately acted within his sound judicial discretion in furtherance of the ends of justice" in granting a mistrial, double jeopardy considerations would not prevent a subsequent trial on the same charge. *Id.*

¶27. Thus, even though this Court might be convinced that the substitution of the alternate juror was a reasonable means of dealing with the problem, that conclusion does not compel this Court to find that there was no "manifest necessity" for a mistrial as that phrase has come to be understood. The decision of the manifest necessity for declaring a mistrial because of juror problems is a matter vested in the sound discretion of the trial court, and we can discover no abuse of that discretion in this instance. We, therefore, conclude this issue to be without merit.

¶28. **THE JUDGMENT OF THE CIRCUIT COURT OF ATTALA COUNTY OF CONVICTION OF COUNT ONE SALE OF LESS THAN ONE OUNCE OF MARIJUANA AND SENTENCE OF THREE YEARS AND $3,000 FINE; COUNT TWO POSSESSION OF MORE THAN ONE OUNCE OF MARIJUANA BUT LESS THAN ONE KILOGRAM WITH INTENT TO DISTRIBUTE AND SENTENCE OF SEVENTEEN YEARS WITH TWELVE YEARS TO SERVE AND FIVE YEARS SUSPENDED WITH PROBATION ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**SOUTHWICK, P.J., BRIDGES, DIAZ, LEE, PAYNE, AND THOMAS, JJ., CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., AND COLEMAN, J.**

IRVING, J., DISSENTING:

¶29. I must respectfully dissent from the majority opinion on the double jeopardy issue. My distinguished colleagues correctly characterize the issue as whether there was a manifest necessity to declare a mistrial. I also agree with the majority's statement that seating an alternate juror is a customary means of dealing with such problems as occurred here, whether an original juror becomes unavailable due to illness or whether it is subsequently discovered that there is some legal impediment to the juror sitting on the case. However, when the mistrial was declared in the case *sub judice*, the alternate juror had already been seated, and the trial was in full progress. Therefore, I cannot embrace the majority's conclusion that the trial court did not

abuse its discretion in declaring the mistrial under the circumstances presented here.

¶30. When the problem involving the missing juror was initially discovered and an alternate was seated, the defendant moved for a mistrial. His motion was rightly denied. How then can it be said to be proper for the trial judge to declare a mistrial, on his own motion, on the same grounds and under the same circumstances that the motion was denied to the defendant, after the missing juror was located? The missing juror was located approximately twenty minutes after the trial had commenced with the alternate juror seated. It must also be pointed out that the court below, in addition to declaring a mistrial on its on motion, apparently did so without giving the defendant an opportunity to object or argue against the motion.[1] Perhaps, the court thought it was not necessary because the defendant had asked earlier for a mistrial.

¶31. In *United States v. Jorn*, 400 U.S. 470, 557, 91 S. Ct. 547 (1970), the United States Supreme Court said:

> If [the defendant's] right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial. Thus, where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error. In the absence of such a motion, the Perez doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings. See United States v. Perez, 9 Wheat., at 580.

The *Jorn* court went on to hold that the trial judge who, on his own motion, declared a mistrial to enable government's witnesses to consult with their own attorneys abused his discretion in discharging the jury and reprosecution of the defendant violated the double jeopardy provision of the Fifth Amendment.

¶32. In *United States v. Starling*, 571 F.2d 934, 938 (5th Cir. 1978), the Starling court said:

> And although a district court is accorded broad discretion in determining that particular circumstances arising at trial require it to abort the proceedings, "reviewing courts have an obligation to satisfy themselves that ... the trial judge exercised 'sound discretion' in declaring a mistrial." (citations omitted) . In particular we must insure that the district court kept in the forefront the defendant's valued right "of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he believes to be favorably disposed to his fate." (citations omitted).

In *Starling,* one of the jurors spoke to the defendant after jury deliberations had begun. Later, this information was brought to the attention of the court, and the court interrupted the jury's deliberations for questioning concerning the episode. After questioning the jurors, the court abruptly declared a mistrial without benefit of any argument from counsel as to the need or propriety of a mistrial. The *Starling* court concluded that the trial court abused its discretion in declaring the mistrial, and noted:

> The record reflects a total lack of awareness of the double-jeopardy consequences of the court's

action and of the manifest necessity standard. Moreover, it shows a crucial failure to consider the appellant's protected interest in having the trial concluded in a single proceeding. Under these circumstances, the very basis for appellate deference to the court's determination that a mistrial was required is diminished beyond the point of significance. (citations omitted).

*Id.* at 941.

¶33. In *Cherry v. Director, State Board of Corrections*, 635 F.2d 414, 418 (5th Cir. 1981), the Fifth Circuit Court of Appeals found that a mistrial which terminated the appellant's first trial did not raise a constitutional bar to his reprosecution because the action of the trial judge was not abrupt, but was taken only after inquiry and overnight deliberation, after at least some consultation with counsel during which Cherry's counsel rejected one available alternative, and after Cherry's counsel was afforded but declined the opportunity to make a motion.

¶34. In *Grandberry v. Bonner*, 653 F.2d 1010, 1014 (5th Cir. 1981), we find these words:

The Supreme Court's reluctance to specify general categories of conditions and circumstances constituting "manifest necessity" reflects the deference which appellate courts are to give to a trial judge's considered determination that manifest necessity for a mistrial exists in a particular case. The decision to declare a mistrial is within the sound discretion of the trial court, Arizona v. Washington, supra at 514, 98 S.Ct. at 834; Cherry v. Director, State Board of Corrections, 635 F.2d 414, 418 (5th Cir. 1981). Thus, the mere existence of alternatives does not mean that the granting of a mistrial precludes retrial of the defendant where "reasonable judges could differ about the proper disposition," Cherry, supra at 419, and where the record, considered as a whole, indicates that the trial judge in deciding to declare a mistrial, carefully considered the alternatives and did not act in an abrupt, erratic or precipitate manner. United States v. Jorn, 400 U.S. 470, 487, 91 S.Ct. 547, 558, 27 L.E.2d 543 (1971); Arizona v. Washington, supra, 434 U.S. at 514-515, 98 S.Ct. at 834, 835; Illinois v. Somerville, supra, 410 U.S. at 469, 93 S.Ct. at 1072-1973.

¶35. In *Grandberry*, the trial judge declared a mistrial after the jury had retired for the night and one of the jurors requested his high blood pressure medicine. The trial judge declared the mistrial after being told by the juror that someone was available at the juror's home who could get the medicine for him. Rather than send for the medicine, the trial judge abruptly declared a mistrial without consulting with defense counsel or the prosecution. In concluding that a second prosecution of Grandberry was constitutionally barred , the *Grandberry* court opined:

The case before us today clearly bears a strong resemblance to *Jorn* and *Starling* and looks very little like Cherry. The trial judge in this case concluded the colloquy with Mr. Noah and then, without addressing either counsel and without pausing long enough for an objection to be registered, embarked on a rather extended statement in the course of which he declared a mistrial. This is precisely type of abrupt and precipitate action which indicates, as we note in Starling, "a total lack of awareness of the double-jeopardy consequences of the court's action and of the manifest necessity standard ... and a crucial failure to consider the appellant's protected interest in having the trial concluded in a single proceeding." Starling at 941. This not a case where a trial judge merely failed to articulate explicitly his consideration of alternatives to a mistrial. See Cherry, supra, rather, this is a case where the circumstances surrounding the decision to declare a mistrial, as chronicled in the record, reveal that no careful thought could have been given to alternatives. Therefore, we reach

today the same conclusion the Supreme Court did in Jorn, and which we have previously reached in Starling: the trial court in this case abused the discretion entrusted to it by declaring a mistrial under these circumstances and in this manner.

*Grandberry,* 653 F.2d at 418.

¶36. As soon as the missing juror was located, the court determined that Jenkins was entitled to be tried by the twelve jurors originally selected, and, on its own motion, declared a mistrial because that could not be done at that time since testimony had been taken. It is a paradox to me that the trial court, believing that Jenkins was entitled to be tried by the original twelve jurors selected, would declare a mistrial on that basis when in fact the very action of declaring the mistrial insured that such would never occur. At least before the declaration of mistrial, Jenkins would have had the benefit of being tried by at least eleven of the original twelve jurors. However, once the mistrial was ordered, whatever right, interest or hope Jenkins had in being tried by any of the original jurors vanished. Thus, any subsequent declaration of mistrial would have to stand anew on the facts and circumstances then existing should a situation be presented for consideration of a mistrial. The only thing that occurred after the alternate juror was seated was the appearance of the missing original juror. Surely, the trial court could not then seat the missing juror who had suddenly appeared, for by now the trial had been in progress for some twenty minutes. Like the *Jorn, Starling* and *Grandberry* courts, I am constrained to conclude on these facts that the trial judge abused his discretion in declaring the mistrial. It thus follows that the retrial of Jenkins is prohibited by the double-jeopardy provision of the Fifth Amendment. Therefore, I would reverse and render.

**KING, P.J., AND COLEMAN, J., JOIN THIS SEPARATE WRITTEN OPINION.**

1. The only evidence we have in the record concerning this occurrence is Jenkins's written motion and the order of the court denying the motion. Neither Jenkins's motion nor the court's order contains any statement that Jenkins was given an opportunity to object before the mistrial was declared. Indeed, the relevant portion of the court's order states: "After a short recess the juror could not be located and the Court seated the alternate. The defendant then moved for a mistrial which motion was denied by the Court. Some testimony was taken by the Court and the missing juror returned to Court. The Court then determined that the defendant was entitled to be tried by the twelve jurors that were originally selected and that that could not be done at that time since testimony had been taken. The Court, on its own motion, then granted a mistrial on the same grounds as the defendant requested in his motion."